ERIC RATH, Plaintiff, *v.* AEROVIAS INTERAMERICANAS DE PANAMA, Defendant.

Supreme Court, Trial Term, New York County, November 25, 1953.

*Bernard Tomson* and *Michael C. Bernstein* for plaintiff.

*James F. Dunn* for defendant appearing specially.

*Leonard P. Moore* for Aero Supply Associates, Inc., and another, third-party claimants.

SAYPOL, J. This is a proceeding under section 924 of the Civil Practice Act tried before me without jury, to determine the title of Aero Supply Associates, Inc., and L. B. S. Aircraft Corporation, third-party claimants (hereinafter called " Aero " and " L.B.S.", respectively) to the sum of $31,684.90 in the possession of United States Aviation Underwriters, Inc., and payable by said underwriter company under a policy of insurance to defendant Aerovias Interamericanas de Panama (hereinafter sometimes called " Avispa ") and the afore-mentioned third-party claimants as their interests may appear. This fund of $31,684.90 was levied upon by the Sheriff of the City of New York on October 17, 1952, under a warrant of attachment obtained by plaintiff on the same day.

Pursuant to said section 924, Mr. Justice BENVENGA, by order dated February 17, 1953, directed a trial of the following issue of title to the insurance proceeds: " Were Aero Supply Associates, Inc. and L. B. S. Aircraft Corporation, on October 17, 1952, entitled to the entire net proceeds amounting to $31,684.90 of a certain policy of insurance No. TF4-3027 issued by The Travelers Fire Insurance Company, insuring a certain Douglas C-47 Aircraft owned by Aerovias Interamericanas de Panama, at the time the said sum, in the possession of United States Aviation Underwriters, Inc., was levied upon by the Sheriff of New York City, or was defendant Aerovias Interamericanas de Panama entitled to the said sum or any part thereof?"

Defendant Avispa is a Panamanian corporation engaged in air transportation between that country and the United States. In the main action by plaintiff against Avispa, the merits of which are not involved in this proceeding, plaintiff seeks to recover $23,565.60 under two causes of action. In the first cause of action, plaintiff, as assignee of Alas, Inc., a Florida corporation, seeks $19,365.60 for moneys advanced for Avispa's account; in the second, he asks $4,200 for services rendered defendant. (Parenthetically, it may be noted [as stated in plaintiff's brief] that an attorney who represented Avispa has also levied a subsequent attachment on the funds in question.)

In the spring of 1952, L. B. S. and Aero were joint owners of a Douglas C-47 aircraft. On June 30, 1952, L. B. S. sold its undivided one half interest therein to Aero for $23,500, payable in six equal monthly installments beginning August 30, 1952. The contract of sale recited Aero's desire to sell the aircraft to a Panamanian purchaser, and provided that if Aero should not obtain cash in payment therefor, it would procure from the purchaser a first mortgage, with a proportionate interest to be assigned to L. B. S. The contract further provided that prior to the removal of the airplane to Panama Aero should " secure * * * and maintain until said promissory note (for $23,500) shall be paid, all risk hull insurance thereon in an amount not less than the amount of Aero's indebtedness to L. B. S. under the aforesaid promissory note, said insurance to be payable separately to Aero and L. B. S. as their interests may appear." L. B. S. has received only the first installment of $3,916.66 on account of the $23,500.

On July 21, 1952, Aero sold the aircraft to defendant Avispa, " free and clear of all liens or encumbrances." The contract, which made no reference to L. B. S., provided for payment in the sum of 93,000 balboas (the equivalent of the U. S. dollar) as follows: 38,345 balboas payable through a numbered series of six bills of exchange from 90 to 365 days after date, with interest at 6% and which " may be negotiated by the seller "; 23,506 balboas payable in seven equal monthly installments, beginning September 1, 1952, with interest at 4%; and the balance in common stock of Avispa in the face amount of 30,000 balboas. The aggregate of the three items, i.e., bills of exchange, notes and common stock is 91,851 balboas rather than $93,000 and is unexplained.

On August 27, 1952, Avispa obtained a policy of insurance on this aircraft from United States Aviation Underwriters, Inc. The policy provided for " loss, if any, payable to " Avispa and L. B. S. " as their respective interests may appear," and stated " the aircraft described is not mortgaged or otherwise encumbered, except: mortgage in the amount of $23,500.00 to L. B. S." On September 15, 1952, the payee clause was amended by a rider naming Avispa and Aero " as their respective interests may appear." This was followed by the statement that " the aircraft described is not mortgaged or otherwise encumbered, except: mortgaged in the amount of $23,500.00 to Aero."

On the same day, September 15, 1952, Avispa, through one Carlos A. de la Guardia (signing as its " General Manager "), wrote to the insurance brokers, Messrs. Cauley & Martin, of Miami, Florida, that Aero should appear as one of the co-beneficiaries in the policy. This letter further stated: " Aero Supply sold this aircraft to Avispa for the sum of $93,500.00, $30,000.00 of which is to be paid by Avispa stock which to date has not been issued. It is understood by us that within the balance of $63,500.00 due Aero Supply is the sum of $23,500.00 which Aero Supply owes L. B. S. Aircraft Co. which should also be protected in the policies in case of loss.

" With the exception of the $30,000.00 to be given Aero Supply in stock the balance of the policies should be made payable to Aero Supply and L. B. S. in the amounts that their interest appear as shown above."

On September 24, 1952, the payee clause was further amended by another rider to provide " loss, if any, payable to " Avispa, L. B. S. and Aero, " as their respective interests may appear," followed by the statement, " the aircraft described is not mortgaged or otherwise encumbered, except: mortgaged in the amount of $23,500.00 to " L. B. S. and Aero.

Two days earlier, on September 22d, the aircraft had been seriously damaged. The insurer subsequently agreed to adjust the loss payable at $54,000. On October 13, 1952, Avispa, through de la Guardia, wrote to Cauley and Martin and, after referring to the agreement of settlement for $54,000 and its letter of September 15th, concluded as follows: " Inasmuch as the settlement agreed upon is *less than* the amount our company owes Aero Supply Associates, Inc., the entire loss payable as agreed upon should be paid directly to Aero Supply Associates, Inc. and to L. B. S. Aircraft Corp. as their interests may appear. This letter is therefore written to advise you that this company *has no interests or rights in the insurance settlement* agreed upon and therefore instruct you to make payments directly to L. B. S. Aircraft Corp. and Aero Supply Associates, Inc., the amount of $23,500.00 to L. B. S. Aircraft Corp. and the remaining balance, less $1,000.00 deductible less premiums and less any other expenses attachable to the insurance policy to be paid directly to Aero Supply Associates, Inc." (Emphasis supplied.)

After deducting premiums due on the policy and after crediting Aero with the sum of $12,000 owed by Aero to the insurer on account of other transactions, there remained the sum of

$31,684.90 in the possession of United States Aviation Underwriters, Inc. It is this sum which was levied upon by the Sheriff on October 17, 1952, pursuant to the warrant of attachment granted to plaintiff on said date. Apparently Avispa has no other assets.

Neither the insurance company nor Avispa makes any claim to the attached funds. In fact, Avispa had previously appeared in the action specially in connection with the attachment, for the purpose of contesting jurisdiction on the ground it had no beneficial interest in the insurance proceeds. At the commencement of the trial of this proceeding, an attorney appeared for Avispa solely to reiterate its position that it had no interest in the fund.

The third-party claimants take the position that their rights are determined solely by the contract of insurance procured by Avispa naming them as third-party beneficiaries. Plaintiff, on the other hand, asserts that absent any express agreement on the part of Avispa to obtain insurance for the benefit of the third-party claimants, they have no lien upon the insurance proceeds, and the lien obtained by him through the attachment is superior to any rights of the claimants. Moreover, says plaintiff, the third-party claimants have not established as a matter of fact that they are entitled to be paid the full balance of the purchase price from the insurance proceeds and have failed to establish that they have not been paid.

The principal question for determination is the effect to be given to the " loss payable " clause with the added words " as interest may appear ". The issue is not free from difficulty (see generally, Patterson & McIntyre, Unsecured Creditor's Insurance, 31 Col. L. Rev. 212, 229–35, and 5 Appleman on Insurance Law and Practice, §§ 3335, 3341). Plaintiff concedes that if Avispa had expressly agreed to procure insurance on the aircraft in favor of Aero and L. B. S., then the third-party claimants would have a superior lien on the insurance proceeds. He seeks to distinguish some of the cases referred to *infra* on the ground that they involved a specific agreement on the part of the debtor (or buyer) to secure insurance for the protection of the creditor (or seller). He maintains that in the absence of such an express agreement, the party so designated in such a loss payable clause is a mere nominee or appointee of the owner-insured to receive the proceeds to the extent of his interest, has no legal or equitable title to the proceeds and has no rights independent of the insured.

It is axiomatic that a policy of property damage insurance is a personal contract which does not attach to or run with the title to the property insured. Therefore a creditor, whether simple or secured has no right in the first instance of a loss to the proceeds of the insurance taken out by the owner and made payable to himself, in the absence of an agreement to insure for the benefit of the creditor (*Brownell* v. *Board of Educ.*, 239 N. Y. 369, 374; *Cromwell* v. *Brooklyn Fire Ins. Co.*, 44 N. Y. 42, 47; *Carter* v. *Rockett*, 8 Paige Ch. 437). Where an owner who has agreed to insure for the benefit of his creditor procures insurance payable to himself alone, the creditor has an equitable lien on the proceeds (*Greenberg* v. *1625 Putnam Ave. Corp.*, 241 App. Div. 623; *Neilson* v. *Ella Realty Co.*, 117 Misc. 213, 223–4, affd. 206 App. Div. 616; *Providence Co. Bank* v. *Benson*, 24 Pick. [Mass.], 204; see note, 92 A. L. R. 559). But since the instant policy named the third-party claimants in the loss payable clause, thus manifesting Avispa's intention to benefit them, the preceding principles of law are not controlling and do not materially assist in determining the issue.

The question as to the priority of claims upon the proceeds of a policy containing a loss payable clause has arisen in only a few cases. In *Farwell* v. *Johnson* (121 Misc. 556), plaintiff had sold merchandise and fixtures to a partnership and had received a promissory note for the unpaid purchase price. The buyer orally agreed to procure insurance payable to plaintiff as his interest might appear. The original stock of merchandise was sold and new stock purchased, with insurance being kept on the entire stock, payable to plaintiff and the partnership. The insured stock of merchandise was destroyed by fire while $7,000 yet remained payable on the note. Between the time of the fire and the delivery of drafts for $13,000 constituting the insurance proceeds, the buyer became bankrupt. Plaintiff sued the trustee in bankruptcy to establish and enforce a lien of $7,000 upon the insurance money. In awarding judgment to plaintiff, the court stated that whether plaintiff had an insurable interest in the insured merchandise was immaterial, since the insurance company had paid the amount of the loss and only the insurer could raise the objection of the want of insurable interest. The court further stated that the right of plaintiff to the insurance proceeds must be determined primarily upon an interpretation of the original agreement by the buyer to procure insurance for him. In this connection, it said (pp. 558–559): "What is the meaning of

such agreement? Plaintiff had sold the stock of merchandise to Lapham & Sawyer; no interest in the merchandise was retained by the plaintiff. He had no lien upon the merchandise for the unpaid purchase price. It is certain that the agreement does not mean that the insurance moneys should be paid to the plaintiff as his interest in the merchandise might appear at the time of possible fire. If it means anything it means that the insurance moneys should be payable to the plaintiff to the extent of the purchase price of the merchandise in 1919 that should remain unpaid at the time of a possible fire. It is very evident that the parties intended that plaintiff should have some interest in the insurance moneys; some lien thereon as security for his debt. There could have been no other object in naming the plaintiff in the policies of insurance."

The foregoing discussion with respect to the buyer's oral agreement to insure appears to have been directed essentially to its interpretation rather than to the necessity of its existence as controlling in that state of facts. Since the loss payable clause therein could be understood only in the setting of the oral agreement to procure insurance, it was obviously necessary to ascertain the meaning of such agreement insofar as coverage was concerned. *Farwell* v. *Johnson* then must be deemed of equivocal import, insofar as it may be said to support plaintiff's argument that a pre-existing agreement to insure for the third parties' benefit is essential in addition to their being named in the loss payable clause.

In *Guiterman* v. *German-Amer. Ins. Co.* (111 Mich. 626), plaintiff sued one Harrison for goods sold and garnisheed defendant insurance company. Defendant had issued a policy containing a clause, " Loss, if any, payable to Eaton, Lyon & Co., of Grand Rapids, Michigan, as their interest may appear." The named beneficiary was a creditor of Harrison. In a short opinion, the court affirmed a judgment for defendant, stating (p. 628): " There is no good reason why a party desiring to purchase goods upon credit may not insure his property for the benefit of his creditor, when the insurer agrees to such arrangement." The opinion itself made no reference to any agreement to procure insurance, but that there was such an agreement is seen from the statement referring to the facts found by the trial court. A few years before the same court had decided that mortgagees named in a loss payable clause were entitled to the proceeds of insurance as against one of the mortgagor's creditors who had garnisheed the insurance company (*Williams* v.

*Buchanan Mfg. Co.,* 102 Mich. 49). No mention was made of any prior agreement to procure insurance. (See, also, *Brady* v. *Botkin,* 269 Mich. 642.)

In *First Nat. Bank of Glen Campbell* v. *Burnside Nat. Bank* (314 Pa. 536), a debtor took out fire insurance policies providing that the " loss, if any, on buildings only payable to Burnside National Bank as its interest may appear." The defendant designated as beneficiary was a judgment creditor junior in point of time to plaintiff. Plaintiff, after a fire, issued attachments execution on its judgments and served the insurance companies as garnishees. The insurers paid the proceeds into court. In holding that the named payee, even though only a, junior judgment creditor, was entitled to the proceeds, the court stated that in the absence of fraud the insured owner " had the right to make the policies payable to whomsoever he pleased, whether the assignee had or had not an estate interest in the property " (p. 539). No reference was made to any prior agreement by the debtor to procure insurance for the designated beneficiary.

In this State of the authorities which, as can be readily seen, are neither very clear nor decisive upon the point at issue, I believe it more consonant with principle and with equitable considerations to hold that, in the absence of any proof of fraud upon other creditors, designation of a creditor as beneficiary in a loss payable clause is effective to create a superior claim upon the proceeds of insurance as against a subsequent attaching creditor even without an express agreement to procure insurance in favor of the named payee. As noted above, some of the preceding cases made no mention of any express agreement, thus inferring at least that its existence was not a matter of controlling significance. In the instant case it is evident from L. B. S.' agreement with Aero, dated June 30, 1952, that those parties intended to have some insurance protection. While there is no direct evidence in the record that Avispa (which has not participated in this proceeding) expressly bound itself to carry insurance for the benefit of L. B. S. and Aero, although this is inferable from the Avispa correspondence regarding amendments of the loss payable clause, it cannot be said that under the present circumstances the beneficiaries named in the loss payable clause are as to the insurance proceeds the claimants to a mere gratuity. That Avispa intended to procure insurance to protect the third-party claimants is manifest from its taking out a policy containing a loss payable clause; and, absent any

element of fraud, it " had the right to make the policies payable to whomsoever he (it) pleased " (*First Nat. Bank of Glen Campbell* v. *Burnside Nat. Bank, supra,* 314 Pa. 536, 539).

While I have neither been referred to nor myself found any case expressly discussing the point raised by plaintiff, I am of the opinion that the loss payable clause in and of itself is sufficient to give the named payee a claim upon the insurance moneys superior to that of one in plaintiff's position. In other words, the loss payable clause designating a payee should be deemed an alternative to, or render unnecessary, an express agreement to insure. Some support for this view is found in dicta in *Lindley* v. *Orr* (83 Ill. App. 70), where it was held that a judgment creditor had no claim to the insurance proceeds merely by virtue of having a lien against the insured property. The court stated (pp. 72, 73, 75): " There is no claim that the insurance was effected by the request of appellants or any of them, or that the insolvent or his assignee had agreed to insure, *or that it was specially intended for the benefit of appellants.* The question arising for decision, therefore, is whether any person except the assured or his assignee, after loss, can rightfully claim from the party to whom the loss has been paid, the proceeds of the policy or any part thereof, by reason of having a lien against the property itself merely, unless by agreement, *or unless the policy was intended or the insurance was effected in whole or in part for his benefit.* * * * [T]he true rule is that policies of insurance against loss by fire are personal contracts with the assured, which do not attach to the property insured, or in any manner go with the same as an incident to a conveyance or transfer of the title, or the creation of a lien thereon, without express agreement *or manifest intention on the part of the assured that the insurance was effected for the benefit of such person interested in the property.* * * * Neither the assured nor his assignee having agreed *or disclosed any purpose or intention to insure the property for the benefit of appellants,* they have no better claim to the proceeds of the policies than any other creditors of the insolvent ". (Emphasis supplied.)

The preceding language from *Lindley* v. *Orr* has been referred to or quoted approvingly in *Zenor* v. *Hayes* (130 Ill. App. 113, 115–116, affd. 228 Ill. 626); *Scott* v. *Judd* (255 Ill. App. 558, 564) and *Federal Land Bank of New Orleans* v. *Thames Lbr. & Supply Co.* (160 Miss. 335, 339–40).

Some additional support for the position taken herein is perhaps found in the holding that a mortgagee may enforce a

standard mortgage clause in a fire policy although he had no knowledge of the existence of the policy until after loss (*Federal Land Bank of Columbia* v. *Atlas Assur. Co.,* 188 N. C. 747, cited in 5 Couch's Cyclopedia of Insurance Law, p. 4424). It would seem that implicit in such decision is the paramount recognition to be afforded the contract of insurance containing the loss payable clause rather than other factors such as a prior agreement to insure or the payee's knowledge of the existence of such contract.

The statement frequently occurs that the payee designated in a loss payable clause such as that found herein is a mere nominee or appointee of the owner insured to receive the proceeds to the extent of his interest (*Lewis* v. *Guardian Fire & Life Assur. Co.,* 181 N. Y. 392; *Woods* v. *Insurance Co. of Pa.,* 82 Wash. 563; *Hartford Fire Ins. Co.* v. *Liddell Co.,* 130 Ga. 8; *Brecht* v. *Law, Union & Crown Ins. Co.,* 160 F. 399; *Barwick* v. *Weschester Fire Ins. Co.,* 266 Ill. App. 574; cf. *Bates* v. *Equitable Ins. Co.,* 10 Wall. [U. S.] 33, and *Sun Insurance Office* v. *Scott,* 284 U. S. 177; see 5 Appleman on Insurance Law and Practice, § 3335, p. 470). On that statement plaintiff maintains that the third-party claimants have no legal or equitable title to the insurance proceeds and have no rights independent of the insured.

Examination of the cases in which such a statement is found shows that in almost every instance there was involved a contest with the insurance company which had refused to pay. Those cases hold in general that the validity of the contract of insurance does not depend upon the existence of an insurable interest in the payee; that the payee is barred by a breach of condition by the insured, and that the contract is subject to such defenses as the insurer may have against the insured. In other words, those cases stand simply for the proposition that in an action wherein the insurer refuses to pay, the payee cannot recover unless the insured could. Since the payee's rights under such clause are generally held to be dependent upon the status of the insured and any default on the part of the insured, which will by the terms of the policy defeat his rights, will also defeat the payee's rights, in the field of mortgagor-mortgagee relationship, there has developed alongside the single or " open " loss payable clause, the standard or union mortgage clause which makes the mortgagee's rights thereunder independent of the mortgagor's (see 5 Couch's Cyclopedia of Insurance Law, §§ 1215–1215d; Vance on Insurance [3d ed.], § 130, and note, 124 A. L. R. 1034). None of the cases stating that the payee is an appointee of the insured hold or suggest that *in an action between rival*

*claimants to the proceeds of insurance,* the payee's rights are only derivative or subordinate to those of the insured. As already indicated, it is my opinion that the designation of the beneficiary in the loss payable clause in itself affords a basis for giving the payee an interest in the proceeds, which interest or claim is superior to that of an attaching creditor. In one jurisdiction it has been held that a loss payable clause in a policy gives the named payee the superior right to recover, to the extent of the amount of his interest, and the insured can only recover any balance in excess (*Girard Fire & Marine Ins. Co.* v. *Gunn,* 221 Ala. 654).

Reference has earlier been made to Avispa's letter of October 13, 1952, addressed to Cauley & Martin, the insurance brokers, and signed by Carlos A. de la Guardia as its '' general manager.'' In that letter (part of which was quoted *supra*), Avispa disclaimed any interest in the insurance proceeds and directed payment thereof to the third-party claimants. Plaintiff questions the authority of de la Guardia to write such letter and apparently further questions his authority to procure the insurance with the original loss payable clause and to seek later the amendments thereto. While it appears that under some circumstances a creditor may urge the question of the lack of authority of a corporate officer to perform a particular act (see 14a C. J., Corporations, § 2260; 19 C. J. S., Corporations, § 1009, and 2 Fletchers Cyclopedia Corporations, § 491), the documentary evidence shows that de la Guardia, who had been Avispa's first president, was holding during the period in question the office of general manager, upon whom was conferred, equally with the president, '' the power of legal representation.'' I find that de la Guardia's acts in procuring the insurance with the loss payable clause, in seeking corrections in the clause, and in writing the letter of October 13, 1952, were not beyond the scope of his authority. It is quite obvious that the final indorsement alone properly reflected what the parties had intended all the time. The letter of October 13, 1952, is merely confirmation of an otherwise evident understanding and added no new rights to the third-party claimants. Moreover, it may well be that since plaintiff's own claim must depend upon the existence of a valid insurance policy under which a loss became payable, he is in no position to question whether such a policy was validly authorized (cf. *Walsh* v. *Tadlock,* 104 F. 2d 131, 133).

In a loss payable clause '' as interest may appear '', it is the interest of the payee at the time of loss rather than at the time of the issuance of the policy which controls (*Fenton* v. *Cascade*

*Mut. Fire Assn. of Washington,* 60 Wash. 389; *Eagle Star & British Dominions* v. *Tadlock,* 22 F. Supp. 545, affd. *sub nom. Walsh* v. *Tadlock, supra,* 104 F. 2d 131). Plaintiff asserts that the third-party claimants have the burden of establishing the extent of their interest in the proceeds and that in view of several factors such as those discussed immediately below, if said claimants have any interest at all in the proceeds, it would be limited to the sum of $3,975. As between the parties to the insurance contract, Avispa concedes the third parties' claim; the plaintiff may not question it. But assuming that plaintiff may make the point, the proof is against him. As stated earlier in this opinion, payment for the aircraft was to be made in part by the issuance of a numbered series of six bills of exchange totalling 38,345 balboas drawn on Avispa by Aero. Four of these bills in the amount of $20,450 were in plaintiff's possession at the time of the trial.

Plaintiff testified that in August, 1952, one Gasper Henry de Maio, Aero's president, owed a personal debt to a partnership which originally operated under the name of World Wide Services of Florida, Inc. and later under the name of Alas, Inc. The partnership consisted of plaintiff, de Maio and two others. The four bills were turned over to plaintiff on account of this indebtedness without indorsement because de Maio told him indorsement was unnecessary for negotiability.

According to de Maio, the bills had been turned over to plaintiff solely because plaintiff had stated he knew some people in New York who might be interested in discounting them so Aero could obtain cash. He told plaintiff that if plaintiff could make satisfactory arrangements for discounting the bills, he would then indorse the bills. When plaintiff returned from New York, he told de Maio that he could get no one to discount the bills, which he had left in New York but would later return. De Maio testified that neither Aero nor he personally owed anything to Alas.

The following facts, namely, that the bills belonged to Aero and not to de Maio (even though he owned 93% of Aero's stock), that Aero owed nothing to Alas, Inc. or plaintiff; that Aero never received anything from the bills in payment of Avispa's indebtedness, and that the bills were not indorsed, in addition to my opinion of the demeanor of the parties on the stand, lead me to the conclusion and I find that the plaintiff is not a transferee nor the owner of the foregoing bills of exchange.

It appears that Aero received $21,400 as salvage money on the sale of the aircraft hull. Plaintiff contends that this sum is applicable to the unpaid balance of the purchase price. Aero asserts that these proceeds were credited against other and separate indebtedness of Avispa. While I am of the opinion that the plaintiff as a creditor of Avispa may not raise the point as to the third parties here, nevertheless I have taken proof on the subject. Furthermore, at the very close of the trial, plaintiff's counsel stated that "we have available in New York books and records which would show the payments on account of these or other invoices." Parenthetically, in the same breath he minimized the validity of his point. Continuing, counsel asked leave to "submit our books and records showing payments on account of these invoices," and counsel was told that an opportunity for further hearing would be afforded, if desired, although I concluded, "It may be after you see your records what you suggest now may be unnecessary." The opportunity was afforded, but the net result after two adjourned hearings is the recantation of his first assertion, i.e., that there was proof of payment available so that there was no application to that purpose of the hull proceeds. Instead, now after the conclusion of the trial plaintiff wants to see the books of Aero to ascertain the fact, not to prove it. In other words he hasn't the proof; he wants to examine not before trial but after trial. That, of course, should not be allowed. Examination of the invoices covering the Avispa indebtedness shows that they apparently relate to spare parts and services required by Avispa and, with some exception, they are dated after the aircraft had been sold to Avispa. I find that the indebtedness evidenced by the invoices was not part of the original purchase price and that Aero could validly credit the $21,400 against such other indebtedness.

I find that Avispa's indebtedness to the third-party claimants on October 17, 1952, exceeded the amount of the fund which was attached.

I determine, therefore, that the third-party claimants were entitled on September 22, 1952 and on October 17, 1952, to the $31,684.90, the proceeds of insurance then in possession of United States Aviation Underwriters, Inc., and that Avispa was entitled to no part of said funds. The application to release the insurance proceeds from attachment must be granted. Settle order on notice including a five-day stay.

The foregoing constitutes the decision of the court as required by the Civil Practice Act, findings having been waived.