**FIREMEN'S FUND AMERICAN IN-SURANCE CO., Plaintiff,**

v.

**KEN–LORI KNITS, INC., et al., Defendants.**

No. 73 C 1242.

United States District Court,
E. D. New York.

May 8, 1975.

Berman & Frost, New York City, for plaintiff.

Frank P. Greenberg, New York City, for Sapperstein, Hochberg & Haberman, Inc.

Borden & Ball, New York City, for Ambassador Factors Corp.

English, Cianciulli, Reisman & Peirez, Mineola, N. Y., for Ken-Lori Knits Inc. and Barrington Knitted Fabrics, Ltd.

David G. Trager, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., for the United States.

Baker & McKenzie, New York City, for Courtaulds North America, Inc.

## MEMORANDUM OF DECISION AND ORDER

MISHLER, Chief Judge.

United States of America, Ambassador Factors Corporation (Ambassador), Sapperstein, Hochberg and Haberman, Inc. (Sapperstein) and Courtaulds North America, Inc. (Courtaulds) move for partial (Ambassador filed a further motion for total) summary judgment against a fund in the amount of $96,750 deposited by plaintiff in this interpleader action with the Treasurer of the United States pursuant to an order dated March 27, 1974.[1] Ken-Lori Knits, Inc., (Ken-Lori) and Barrington Knitted Fabrics, Ltd. (Barrington) concede in their answer that they have no present interest in the fund and allege that their interest had been assigned to Ambassador. The other defendants have not an-

1. The fund represents a fire loss to a building located at 500 Stagg Street in the Borough of Brooklyn, County of Kings, and contents, which occurred on October 16, 1972.

swered the motions or appeared in opposition to the motions.

## BASIS OF CLAIMS

Ken-Lori was engaged in the business of converting yarn into cloth in premises which it leased at 500 Stagg Street, Brooklyn. It installed knitting machinery and equipment and conducted its business at that address. Ken-Lori operated a service to the trade by converting the yarn of others for which it charged a fee computed by the pound. Ken-Lori was a contract knitter and also converted its own yarn. All the machinery, equipment, fixtures and furniture on the premises at 500 Stagg Street were owned by Ken-Lori at all the pertinent times referred to herein.

Barrington delivered yarn to Ken-Lori for conversion to cloth. The interests that controlled Ken-Lori also controlled Barrington.[2] Barrington was a domestic corporation with offices at 135 West 35th Street in the City and County of New York.

On January 4, 1972, Ambassador loaned Ken-Lori $100,000. Ken-Lori at the time of the loan or prior thereto, executed a security agreement in favor of Ambassador. Ambassador filed financing statements in the office of the Register of Kings County on January 27, 1972, and in the office of the Secretary of State of New York on January 28, 1972. At the time of the execution of the promissory note in favor of Ambassador and the security agreement, there existed a policy of fire insurance (policy number MXPL 158 87 75) issued by Firemen's Fund American Insurance Companies (Firemen's) effective April 10, 1971, for a term of three years, insuring "the furniture, fixtures, machinery and equipment usual to the manufacture of knitwear" and "the contents of yarn of Ken-Lori" in the amount of

$300,000. A rider to the policy dated January 4, 1972 stated that:

> "Loss, if any, due to the insured under all of the terms and conditions of this policy, to be payable to Ambassador Factors, Corp., 1470 Broadway [sic], N.Y., N.Y., as interest may appear."

A rider to the same policy dated February 14, 1972, apparently intending to add Barrington as a named insured, named "Barrington Mills, Inc." and insured "contents of yarn while contained in the building" in the amount of $50,000. A subsequent rider dated May 15, 1972, corrected the name to read "Barrington Knitted Fabrics, Ltd."

On June 12, 1972, Ambassador loaned Ken-Lori an additional $100,000, and Ken-Lori executed a promissory note in the amount of $200,000 and a security agreement in favor of Ambassador. A rider to the security agreement provided:

> ". . . Debtor hereby appoints the Secured Party the attorney for the Debtor in obtaining, adjusting and cancelling any such insurance and endorsing settlement drafts and hereby assigns to the Secured Party all sums which may become payable under such insurance . . . as additional security for the indebtedness."

On the day of the fire, i. e., October 16, 1972, Handelsman retained Sapperstein to adjust the fire loss claim at a fee of 12% of the amount of recovery and assigned to Sapperstein the amount of the claim due to the extent of this fee. The retainer was signed:

> "Robert Handelsman, Pres.
> Ken-Lori Knits, Inc."[3]

The United States of America's claim of priority is based on assessments made against Ken-Lori and Barrington for withholding, Federal Insurance Contri-

---

2. Benedict Pape testified that Barrington was a subsidiary of Ken-Lori (Deposition January 25, 1975, p. 5). Frank Pape was president of Barrington and vice-president of Ken-Lori. Robert Handelsman was president of Ken-Lori and vice-president of Barrington. Benedict Pape was secretary of both Ken-Lori and Barrington.

3. The fee was subsequently fixed at $1,500.

butions Act, and Federal Unemployment Tax Act taxes, penalties and interest. The taxes assessed against Ken-Lori are alleged to be as follows:

| Taxable Period | Assessment Notice And Demand Note | Unpaid Assessed Balance | Balance Due |
|---|---|---|---|
| 3/31/72 | 11/20/72 | $ 263.80 | $ 287.53 |
| 6/30/72 | 3/14/73 | 12,082.56 | 13,146.60 |
| 9/30/72 | 3/14/73 | 8,485.77 | 9,088.30 |
| 12/31/72 | 3/14/73 | 2,600.64 | 2,768.04 |
| 12/31/72 | 3/14/73 | 470.59 | 504.71 |

The taxes assessed against Barrington are alleged to be as follows:

| Taxable Period | Assessment Notice And Demand Note | Unpaid Assessed Balance | Balance Due |
|---|---|---|---|
| 9/30/72 | 6/18/73 | $ 3,597.66 | $ 3,905.83 |
| 12/31/72 | 6/18/73 | 2,091.91 | 2,173.97 |
| 12/31/72 | 6/25/73 | 225.62 | 239.37 |
| 6/30/72 | 5/14/73 | 824.15 | 870.46 |

The government claims that each notice of assessment was served on the taxpayer on the date of notice and demand above set forth. On March 16, 1973, notices of the liens against Ken-Lori were filed in the office of the Register of Kings County, and on March 19, 1973, in the office of the Secretary of State of New York. With regard to the Barrington liens, notices were filed in the office of the Register of Kings County on July 11, 1973, and on September 11, 1973.

Courtaulds lays claim to the portion of the proceeds due Barrington through a judgment obtained against Barrington in the amount of $29,244.26, which judgment was filed in the Supreme Court of the State of New York, New York County, on August 15, 1973, and docketed in the office of the Clerk of Kings County on August 20, 1973. Execution was issued to the Sheriff of the City of New York. The Sheriff served an "Execution with Notice to Garnishee" on Firemen's on August 30, 1973.

## SETTLEMENT OF THE FIRE LOSS

The policy limits were $300,000 for furniture, fixtures, machinery and equipment, and $50,000 for yarn and finished goods. The fire loss claim for furniture, fixtures, machinery and equipment was $154,858, and the claim for yarn and finished goods was $60,112.91. Firemen's representative and Sapperstein[4] compromised the claims. The furniture, fixtures, machinery and equipment claim was settled for $75,136.60 and the yarn and finished goods claim for $21,985.56. Further adjustments were made in these figures and the final total settlement figure was $96,750.[5] There was no allocation of the

4. He was joined later in the negotiations and then replaced by counsel for Ken-Lori and Barrington.

5. Ambassador has asked for summary judgment in the amount of $75,136.60. However, when the total settlement figure was finally adjusted to $96,750 each of the component figures was reduced proportionately. Therefore, the amount of the fund attributable to the furniture, fixtures, machinery and equipment claim is now $74,845.80 and the amount attributable to the yarn is $21,904.-20.

290

proceeds from the loss of contents, i.e., yarn and finished goods, between Ken-Lori and Barrington.[6]

### AMBASSADOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT

At the time of the fire, Ken-Lori was indebted to Ambassador under the terms of the security agreement in an amount in excess of $200,000; Barrington was indebted to Ambassador in a sum in excess of $4,500. Ken-Lori and Barrington both assert that Ambassador has succeeded to their interests in the fund. Courtaulds concedes that Ambassador is entitled to $74,845.80 as a secured creditor of Ken-Lori.[7]

Ambassador's priority right to the proceeds from the fire loss of the furniture, fixtures, machinery and equipment is challenged primarily by the government. The government concedes that Ambassador may have had a perfected security interest with regard to the original collateral. Section 9–306(1) of the Uniform Commercial Code (UCC) defines proceeds as "whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of." According to the government, this definition does not include proceeds from an insurance policy. Two cases are cited in support of this position, *Universal C.I.T. Credit Corp. v. Prudential Investment Corp.*, 101 R.I. 287, 222 A.2d 571 (1966), and *Quigley v. Caron*, 247 A.2d 94 (Me. 1968). In the first case, the court held that the casualty loss of a tractor, the collateral for the security agreement at issue, was not a sale, exchange, collection or other disposition for the purposes of UCC § 9–306(1). Therefore, the secured creditor was not entitled to the insurance proceeds paid on the loss of the tractor. Similarly in *Quigley*, the court stated

that a security agreement does not create a continuing security interest in payments due from an insurance company on a loss. Both cases may be distinguished from the case presently under consideration, however, for in neither security agreement was there an obligation on the part of the debtor to procure insurance to protect the secured party who ultimately attempted to collect the insurance proceeds. In contrast, the court in *In re Hunter*, 9 UCC Rep. 928 (S.D.Ohio 1971) held that where the debtor was required by the security agreement to procure insurance on the collateral with a loss payable clause to the benefit of the secured party, then any proceeds from that insurance policy on the destruction of the collateral should go to the secured party as proceeds under UCC § 9–306(1). Where such an insurance arrangement existed, the collateral upon destruction would be deemed "otherwise disposed of" for the purposes of § 9–306.

■ *Hunter* is thus a far more applicable precedent than *Quigley* or *Universal C.I.T. Credit Corp.*, for in the instant case there was the same obligation on the part of the debtor, Ken-Lori, to carry insurance in favor of the secured party, Ambassador. The "proceeds" box on both security agreements was checked; a rider to the second security agreement assigned "all sums which may become payable under such insurance" to Ambassador as further security for its loan to Ken-Lori; a rider was attached to the insurance policy making the loss payable to Ambassador "as interests may appear." While one of these steps alone might not have been sufficient, the cumulative effect makes clear the intention of the parties that Ambassador have the status of a secured creditor with regard to the insurance

6. Robert J. Brassell, an employee of General Adjustment Bureau, Inc., Firemen's adjuster, indicated that some cartons of finished goods were tagged "Barrington Knit," "Barrington Mills" and "B"; some cartons indicated that the merchandise had been delivered to Ken-Lori; and some cartons indicated that the yarn and finished goods were owned by Ken-Lori customers.

7. Courtaulds claims that the balance of $21,904.20 represents the loss to yarn and finished goods.

proceeds. Under these circumstances, § 9–306(1) should be read to include insurance proceeds.

Apart from the UCC argument, the government also challenges Ambassador's claim on the ground that an insurance contract is personal to the parties who made the contract and the right to the proceeds does not run with title to the property. Therefore, the government argues, only Ken-Lori as the named insured was entitled to receive the proceeds; Ambassador's interest in the property does not include an interest in the insurance policy. *Rath v. Aerovias Interamericanas de Panama,* 205 Misc. 135, 127 N.Y.S.2d 231 (N.Y.County Sup.Ct. 1953), cited by the government, is only preliminarily helpful to the government's position. The court there affirmed the principle argued by the government that an insurance policy is personal and does not run with title to the insured property. However, the court then went on to discuss the impact of a loss payable clause in the insurance policy, saying that the existence of such a clause diminishes the applicability of these basic rules. Discussing the relative positions of rival claimants to insurance proceeds, the court held (205 Misc. at 142, 127 N.Y.S.2d at 239):

> [I]n the absence of any proof of fraud upon other creditors, designation of a creditor as a beneficiary in a loss payable clause is effective to create a superior claim upon the proceeds of insurance as against a subsequent attaching creditor even without an express agreement to procure insurance in favor of the named payee.

*Rath* is clearly applicable to the instant case, where there was a loss payable clause and an agreement that insurance would be procured for the benefit of Ambassador. The government further argues that a loss payable clause is not sufficient to protect Ambassador's priority, citing *Fields v. Western Millers Mutual Fire Insurance Co.,* 290 N.Y. 209, 48 N.E.2d 489 (1943). In that case, the court stated that the sole effect of a loss payable clause was to make the payee a nominee of the owner of the property. However, the court went on to say that where a policy is payable to the owner and the payee named in the loss payable clause "as their interests may appear," then the insurable interest of the payee is protected. 290 N.Y. at 212, 48 N.E.2d 489. The rider attached to Ken-Lori's insurance policy made the loss payable to Ambassador "as interest may appear," clearly sufficient to protect Ambassador's claim to the proceeds.

The government's final challenge to Ambassador's priority is based on the argument that Ambassador's lien is not choate and a federal tax lien has priority over a prior inchoate lien. The government asserts that there is a question as to whether the proceeds even became payable on August 16, 1973, when Firemen's filed this interpleader action conceding that $96,750 was owed under the policy. The tax liens were filed prior to that date and are choate as of the date of assessment.

In fact, Ambassador's lien became choate at least at the date of the fire, October 15, 1972, when Firemen's obligation to pay on the policy accrued. It may well have become choate when, with the perfecting of the security agreement, Ambassador obtained present rights in the insurance policy to receive payments in the future in the event of damage to the property. *In re Rosenberg's Will,* 62 Misc.2d 12, 308 N.Y.S.2d 51 (Kings County Sur.Ct. 1970). Both the perfection of the security agreement and the fire occurred prior to the filing of the federal tax lien. Ambassador had done everything necessary and everything possible to perfect its interest in the insurance proceeds, and it is clear that the parties intended that Ambassador have a secured interest in the proceeds. Under both the UCC and the plain provisions of the insurance policy, Ambassador has priority in its claim on the insurance proceeds over the government whose tax lien is subsequent in time.

The final challenge to Ambassador's right to the proceeds in the amount of $74,845.80 comes from Sapperstein to the extent of his fee. At oral argument on the motions, Ambassador agreed to pay Sapperstein's claim out of the proceeds without apportionment between the funds due the two named insureds, Ken-Lori and Barrington. Since there are no other issues of fact presented as to this fund, partial summary judgment is granted in favor of Ambassador in the amount of $73,345.80 and in favor of Sapperstein in the amount of $1,500.

## SUMMARY JUDGMENT AS TO THE REMAINDER OF THE PROCEEDS

The remainder of the proceeds, i. e., $21,904.20, is attributable to the loss of the yarn and is claimed by Ambassador, the United States and Courtaulds. However, the relative priorities of these parties cannot be determined on a motion for summary judgment because the ownership of the destroyed yarn has not been established and the rights of the parties depend on this factual determination.

Ambassador asserts that it is entitled to the proceeds regardless of the ownership of the yarn. Its claim rests on the insurance contract and the guarantees of payment by Ken-Lori and Barrington of their indebtedness to Ambassador. Courtaulds bases its claim on a judgment obtained against Barrington in the amount of $29,224.26. The priority of this claim can be considered only when it is determined what portion of the destroyed yarn belonged to Barrington. The government's claim rests on tax liens filed against both Ken-Lori and Barrington.

█ At most, the independent adjuster who investigated the fire loss was able to say that some of the tags marking the yarn indicated ownership by Barrington.[8] But the Barrington label was by no means clear on every tag, and not all of the destroyed goods were tagged. Where such an essential factual issue remains unresolved, summary judgment is not appropriate. It is "too blunt a weapon" with which to deal with such complex litigation. *Miller v. General Outdoor Advertising Co.*, 337 F.2d 944, 948 (2d Cir. 1964). It would not be proper for this court to draw inferences from the adjuster's report as to the ownership of the yarn. *Empire Electronics Co. v. United States*, 311 F.2d 175 (2d Cir. 1962). This is an issue of fact which must be left for trial.

Interpleader defendant Ambassador's motion for partial summary judgment is granted in the amount of $73,345.80. Interpleader defendant Sapperstein's motion for partial summary judgment is granted in the amount of $1,500. Ambassador's motion for total summary judgment and the motions of the interpleader defendants the United States and Courtaulds for summary judgment are denied, and it is

So ordered.

The Clerk or the Court is directed to enter judgment in favor of Ambassador in the amount of $73,345.80 and in favor of Sapperstein in the amount of $1,500. There is no just reason for delay in the entry of this judgment.

---

8. Deposition of Robert J. Brassell, employee of General Adjustment Bureau, April 26, 1974.