**Leonard L. ETTINGER, Trustee in Bankruptcy of John S. Milne, Inc.**

**v.**

**CENTRAL PENN NATIONAL BANK.**

Civ. A. No. 78–3259.

United States District Court,
E. D. Pennsylvania.

Dec. 6, 1979.

James W. Adelman, Philadelphia, Pa., for plaintiff.

Robert A. Kargen, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

BECHTLE, District Judge.

Presently before the Court are the cross-motions of the parties for summary judgment, pursuant to Fed.R.Civ.P. 56. This action is brought by the trustee in bankruptcy, Leonard L. Ettinger ("plaintiff"), for John S. Milne, Inc. ("Bankrupt"), against defendant Central Penn National Bank ("Bank"), pursuant to section 60(b) of the Bankruptcy Act, 11 U.S.C. § 96, for recovery of the alleged preferential payment of $39,235 made by the Bankrupt to the defendant Bank.

The plaintiff is a resident of the Commonwealth of Pennsylvania. The defendant Bank is doing business in Pennsylvania and the Bankrupt is incorporated in Pennsylvania.[1] The precise issue before the

1. By leave of Court and consent of the parties, the Frankford-Quaker Grocery Company ("petitioner.") has submitted a memorandum of law as *amicus curiae* in opposition to plaintiff's motion for summary judgment. Petitioner is not an actual party in the present litigation but

Court is whether monies received by the beneficiary of a fire insurance policy for damages to personal property, which was pledged as collateral under a security agreement and recorded in a financing statement, constitute "proceeds" within the meaning of § 9–306 of the Uniform Commercial Code (1964 version) ("UCC") as adopted by the Pennsylvania legislature. After careful consideration of the decisional law and the well-briefed arguments of counsel, for all of the reasons set forth below, the Court finds that insurance proceeds are "proceeds" under § 9–306 of the UCC. However, the Court also finds that the holding on the issue of proceeds should not be retroactively applied against the parties in the instant action. Therefore, the Court will refer the case to the bankruptcy court for further proceedings in respect to the issues raised by the parties under sections 60 and 70 of the Bankruptcy Act. Finally, the Court will certify, *sua sponte* for immediate appeal pursuant to 28 U.S.C. § 1292(b), the single issue of retroactivity.

The facts as stipulated to by the parties are as follows: On July 20, 1970, the Bankrupt and the Bank entered into a business financing arrangement whereby they executed and delivered to the Bank a security agreement granting to the Bank a security interest in all of the Bankrupt's furnishings, fixtures, inventory and proceeds thereof. The security interest was properly perfected by the timely filing of an appropriate financing statement, with continuation statements being subsequently filed.[2]

On July 20, 1977, the Bank loaned the sum of $41,762.64 to the Bankrupt and received in return a time note obligating the Bankrupt to repay the Bank within 30 days with interest. The loan was secured under the original-but-continued July 20, 1970, security agreement.

Prior to July 20, 1977, the Bankrupt had filed a Chapter XI petition in bankruptcy, 11 U.S.C. § 722. On July 11, 1977, and by order of the bankruptcy court, the Bankrupt was retained as debtor-in-possession. Subsequently, the Bank filed a complaint for relief from the automatic stay provisions of section 311, pursuant to Bankruptcy Rule 11–44, 11 U.S.C. § 711, seeking to collect the debt. On or about October 18, 1977, but before a hearing on that complaint, the Bankrupt's retail store suffered substantial damage as a result of a fire in an adjoining store. Included in the damages were the goods and inventory covered by the Bank's prior security agreement. As a result of the fire, the Bankrupt was forced to go out of business.

Four days after the fire, but without knowledge of it, the bankruptcy court, acting on the Bank's complaint, dissolved the automatic stay and thus enabled the Bank to proceed with enforcement of its security rights to collect its debt. At the same time, the court dismissed the Chapter XI proceedings due to the Bankrupt's lack of assets beyond those secured by the Bank.

The security agreement between the Bank and the Bankrupt had provided that the Bankrupt was to maintain fire insurance on the collateral. After the Chapter XI proceedings had begun, but five days prior to the fire, without actual notice to the bankruptcy court or to the other creditors, the Bankrupt designated the Bank as the loss payee under the insurance policy.

On November 22, 1977, after receiving the payment under the insurance policy for losses due to the fire, the Bankrupt paid over to the Bank the insurance monies in the sum of $39,235, which the Bank credited against the outstanding indebtedness of the Bankrupt, leaving a balance due of $2,527.64. As a direct result of the Bankrupt's payment to the Bank, the other credi-

is a party to another unrelated action in another court which also concerns the issue of the status of insurance payments as "proceeds" under § 9–306.

**2.** The security interest was perfected by the filing of appropriate financing statements with the Secretary of the Commonwealth of Penn-

sylvania on July 23, 1970, and locally with the Montgomery County Prothonotary on July 28, 1970, and the Bucks County Prothonotary on July 23, 1970. Continuation statements were subsequently filed on June 25, 1975, June 25, 1975, and June 24, 1975, respectively.

tors filed an involuntary petition for bankruptcy on November 30, 1977, against the Bankrupt. By order of adjudication dated March 10, 1978, the bankruptcy court granted the petition. On June 8, 1978, the plaintiff was appointed trustee in bankruptcy by the bankruptcy court. This action was commenced on September 29, 1978, by the plaintiff-trustee on behalf of the Bankrupt's estate, pursuant to authority to initiate the action granted by the bankruptcy court.

Plaintiff maintains that the Bank does not have a perfected security interest in the insurance proceeds and is not entitled to the monies as a loss payee under the policy. First, plaintiff asserts that the insurance proceeds are not "proceeds" within the meaning of § 9–306 of the UCC (1964 version); and, therefore, the Bank does not have a continuing security interest in the insurance monies. Second, since the Bank was designated as a loss payee during the pendency of the Chapter XI bankruptcy proceedings without the consent or knowledge of the bankruptcy court, the designation was without force under section 70 of the Bankruptcy Act, 11 U.S.C. § 110, and is, therefore, subject to defeat by the trustee in bankruptcy. Third, the Bankrupt made a voidable preferential transfer to the Bank under section 60 of the Bankruptcy Act, 11 U.S.C. § 96. The defendant Bank, and the petitioner as *amicus curiae*, contend that proceeds under § 9–306 include insurance proceeds and, therefore, the Bank has a continuing perfected security interest in the insurance monies, irrespective of the loss payee designation. Upon careful review and consideration of the decisional law, arguments of counsel, scholarly commentaries and the UCC official commentary, this

Court accepts the view of the Bank. Section 9–306 of the UCC (1964 version), as adopted by the Pennsylvania legislature, provides, in pertinent part, that:

(1) "Proceeds" includes whatever is received when collateral or *proceeds is sold, exchanged, collected or otherwise disposed of.* The term also includes the account arising when the right to payment is earned under a contract right. Money, checks and the like are "cash proceeds". All other proceeds are "non-cash proceeds".

(2) Except where this Article otherwise provides, a security interest *continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor* unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

12A P.S.Pa. § 9–306(1), (2) (emphasis added).

The inexactness of the UCC framers, in defining precisely what constitutes "proceeds" under § 9–306, has led to sharp controversy among the courts and has spawned numerous articles and commentaries. Initially, this Court must determine whether it should foray into this legal quagmire in light of: (1) the lack of applicable state law on the subject; and, (2) the recently proposed amendment to § 9–306,[3] which clearly and expressly includes insurance proceeds within the definition of "proceeds," and which the Pennsylvania legislature has, to date, failed to adopt.

## I. Choice of Law

■ This is a case of first impression in both Pennsylvania state and federal courts.

---

**3.** The 1972 amendment to § 9–306 states:

"Proceeds" includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement. Money, checks, deposit accounts and the like are "cash proceeds". All other proceeds are "non-cash proceeds".

The official comment to the amendment states, in pertinent part:

The new second sentence of subsection (1) is intended to overrule various cases to the effect that proceeds of insurance on collateral are not proceeds of the collateral. The "except" clause is intended to say that if the insurance contract specifies the person to whom the insurance is payable, the concept of "proceeds" will not interfere with performance of the contract.

In deciding issues founded upon state law, federal courts must determine state law by looking to either state legislative pronouncements or the decisions of the state's highest court. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Where the highest court of the state or the legislature has not spoken, "federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the state . . . [thus] it may be said to be, in effect, sitting as a state court." *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967); *Bernhardt v. Polygraphic Co.*, 350 U.S. 198, 203, 76 S.Ct. 273, 100 L.Ed. 199 (1956).

Furthermore, in addressing the precise issue of whether insurance monies constitute "proceeds" under § 9–306, the Fifth Circuit Court of Appeals recently held in *Aetna Ins. Co. v. Texas Thermal Industries, Inc.*, 591 F.2d 1035 (5th Cir. 1979), that:

> Resolution of the question of course requires us to look to state law. Unfortunately, there are no Texas decisions directly on point. We believe, however, that the Texas Supreme Court, were it presented with this question, would hold that the insurance fund constitutes proceeds of the secured collateral.

591 F.2d at 1039.

The sole Pennsylvania state court decision that relates tangentially to the issue of the status of insurance monies under § 9–306 is *Hoffman v. Snack*, 37 Pa.D. & C.2d 145, 2 UCC Rept. 862 (Allegheny County 1964), which the plaintiff urges us to follow as precedent. In *Hoffman*, plaintiff sued for personal injuries and property damages arising out of an automobile accident involving plaintiff's car. Before the court was a petition to intervene as a party-plaintiff filed by a finance company which held a security interest in the damaged automobile. The car was not insured at the time of the accident, although the debtor was required to maintain insurance on the car as part of the security agreement. The court denied the motion to intervene but stated in *dicta* that:

> . . . The only distinction between petitioner and any other general creditor of plaintiff is that petitioner happens to have a security interest in the automobile greatly depreciated from the accident, yet still in respondent's possession. While we agree that section 9–306(2) of the Uniform Commercial Code of April 6, 1953, P.L. 3, provides for the continuation of a security interest in the proceeds derived from an unauthorized "sale, exchange, or other disposition of the property", we do not feel that this section can be extended to include instances where the property has not been transferred but has simply become depreciated through no fault of the debtor. *Absent a sale, exchange or other disposition, there can be no proceeds such as this section contemplates. Petitioner's security remains solely in the depreciated automobile still in respondent's possession.*

37 Pa.D. & C.2d at 147 (emphasis added).

The *Hoffman* decision can be distinguished in several aspects. First, the suit was not "an action to recover proceeds of property insurance resulting from the destruction of that automobile" as plaintiff incorrectly asserts. Plaintiff's Answer and Cross-Motion for Summary Judgment, at 9. Furthermore, as defendant correctly notes, the debtor in *Hoffman* never received any insurance proceeds because there was no insurance policy in force on the automobile. Therefore, the quoted statement is merely *dicta*, and whatever precedential value the *Hoffman* decision merits is based solely on the principle of "stare dictis"[4] rendered by a state trial court and not upon a clear holding.

A controversy has been raging between various circuit courts on the issue of whether federal courts should be conclusively

---

**4.** *See* Boner, *Erie v. Tompkins*: A Study in Judicial Precedent, II, 40 *Tex.L.Rev.* 619, 623 (1962), where the author warns against federal courts substituting "stare dictis" for "stare de- cisis" which will thwart the policy considerations underlining *Erie* stating that federal courts should only be bound by the "decisions" of the highest court of the state.

bound by, only give weight to or totally disregard *dicta* set forth in state court decisions.[5]

In *Commissioner v. Estate of Bosch, supra,* 387 U.S. at 465, 87 S.Ct. 1776, the Court held that a "decision" of a state trial court, not merely *dicta,* "should *a fortiori* not be controlling. This is but an application of the rule of *Erie R. Co. v. Tompkins, supra,* where state law as announced by the highest court of the state is to be followed." *Id.* at 465, 87 S.Ct. at 1783. If "decisions" of state trial courts are not controlling, then certainly mere "dicta" rendered by state trial courts is even less controlling.

The extreme tenuousness of the *Hoffman* decision with respect to the issue presented before this Court severely limits any precedential value the decision may have and, therefore, is not to be held as controlling on the issue of the status of insurance proceeds under § 9–306.

II. *Legislative Inaction*

Finally, other federal courts faced with the dilemma of whether to act in light of legislative inaction in this context have opted to decide the issues presented. *See Aetna Ins. Co. v. Texas Thermal Industries, Inc., supra; Paskow v. Calvert Fire Ins. Co.,* 579 F.2d 949 (5th Cir. 1978); *PPG Industries, Inc. v. Hartford Fire Ins. Co.,* 531 F.2d 58 (2d Cir. 1976). In *PPG,* the Second Circuit Court of Appeals held that:

Although this amendment has not yet been adopted in New York, it is a persuasive indication of the effect which § 9–306 was *originally intended to have.* Since no New York court has ruled on this question, the fact that the state legislature had not yet enacted this amendment does not preclude a federal court

from rendering a decision which is consistent with the *original intention underlying § 9–306.* For this reason, the district court was correct in holding that PPG had a security interest in the proceeds of the insurance policy.

531 F.2d at 61 (emphasis added).

While other federal courts have hesitated to act, pending state legislative adoption of the proposed 1972 amendment to § 9–306, *In re Parks Hamilton Bank of Roane County v. Bell,* 19 UCC Rept. 334, 335 (E.D.Tenn.1976); *In re Waltman Appliance Buyers Credit Corp. v. Stikes,* 18 UCC Rept. 576, 579 (S.D.Ala.1975), this Court concurs with the reasoning of the Second Circuit in *PPG.* This conclusion is further supported by the holding of the Supreme Court in *Meredith v. Winter Haven,* 320 U.S. 228, 234–235, 64 S.Ct. 7, 88 L.Ed. 9 (1943), that a federal court cannot decline to decide questions of state law[6] merely because they are difficult or uncertain or have not been ruled upon by the highest court of the state. Under the *Erie* doctrine, this reasoning would equally apply where a question has not been acted upon by the state legislature.[7]

Accordingly, this Court will attempt to decide afresh the issue of proceeds under § 9–306 by looking to what the Pennsylvania Supreme Court would hold as to the original intention underlying § 9–306 (1964 version).

III. *Insurance Proceeds Under § 9–306 of the UCC*

Initially, a few basic tenets should be borne in mind throughout the Court's discussion. First, courts are required to afford a liberal construction to the provisions of the Uniform Commercial Code by

---

5. *See* C. Wright, *Law of Federal Courts,* 270 & nn. 24, 25 (3d Ed. 1976), and cases cited therein.

6. There are public policy and jurisdictional exceptions to this general rule, but they are not relevant to the instant action. *See Meredith v. Winter Haven, supra,* 320 U.S. at 234–236, 64 S.Ct. 7.

7. The Supreme Court in *Erie* held that, "whether the law of the State shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern." 304 U.S. at 78, 58 S.Ct. at 822. This equality of pronouncement under *Erie* should similarly apply where neither the highest court of the state nor the state legislature has spoken to a particular issue.

looking to the underlying purposes and policies of the UCC, rather than the strict letter of the provisions, when they appear· at odds with those policies and purposes. As § 1–102 of the UCC provides, in relevant part:

(1) This Act shall be liberally construed and applied to promote its underlying purposes and policies.

(2) Underlying purposes and policies of this Act are

(a) to simplify, clarify and modernize the law governing commercial transactions;

(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;

(c) to make uniform the law among the various jurisdictions.

12A P.S.Pa. § 1–102.

Additionally, the official comment to § 1–102 provides, in pertinent part:

The Act should be construed in accordance with its underlying purposes and policies. The text of each section should be read in the light of the purpose and policy of the rule or principle in question, as also of the Act as a whole, and the application of the language should be construed narrowly or broadly, as the case may be, in conformity with the purposes and policies involved.

Secondly, in defining proceeds, the UCC states in § 9–203(1)(b), that:

(1) Subject to the provisions of Section 4–208 on the security interest of a collecting bank and Section 9–113 on a security interest arising under the Article on Sales, a security interest is not enforceable against the debtor or third parties unless

\* \* \* \* \* \*

(b) the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops or oil, gas or minerals to be extracted or timber to be cut, a description of the land concerned. In describing collateral, the word "proceeds" is sufficient without further description to cover proceeds of any character.

12A P.S.Pa. § 9–203(1)(b).

■ Finally, under the UCC, a secured party is generally favored in bankruptcy proceedings over unsecured creditors under the language of § 9–306(4),[8] which provides:

(4) In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest

(a) in identifiable non-cash proceeds;

(b) in identifiable cash proceeds in the form of money which is not commingled with other money or deposited in a bank account prior to the insolvency proceedings;

(c) in identifiable cash proceeds in the form of checks and the like which are not deposited in a bank account prior to the insolvency proceedings; and

(d) in all cash and bank accounts of the debtor, if other cash proceeds have been commingled or deposited in a bank account, but the perfected security interest under this paragraph (d) is

---

8. Comment 2(a) to § 9–306(4) provides:
 2. Changes from Prior Law:
 (a) Whether a debtor's sale of collateral was authorized or unauthorized, prior law generally gave the secured party a claim to the proceeds. Sometimes it was said that the security interest attached to the "property" received in substitution; sometimes it was said the debtor held the proceeds as "trustee" or "agent" for the secured party. Whatever the formulation of the rule, the secured party, if he could trace the proceeds, could reclaim them or their equivalent from the debtor or his trustee in bankruptcy. The change in existing law made by this Section relates to non-identifiable cash proceeds; the secured party has, under conditions stated in subsection (4)(d), a security interest in the debtor's cash and bank accounts equal to the amount of cash proceeds received and commingled or deposited within the 10 days before insolvency proceedings were instituted less the amount of cash proceeds received by the debtor and paid over to the secured party during that period, without regard to whether or not the funds are identifiable as cash proceeds of the collateral.

(i) subject to any right of set-off; and (ii) limited to an amount not greater than the amount of any cash proceeds received by the debtor within ten days before the institution of the insolvency proceedings and commingled or deposited in a bank account prior to the insolvency proceedings less the amount of cash proceeds received by the debtor and paid over to the secured party during the ten day period.

■ The Court finds that insurance monies are "proceeds" within the meaning of § 9–306 in light of these basic tenets, the common dictionary definition of the term "proceeds" [9] and for all the other equitable considerations and reasons of statutory construction that are set forth more fully below.

The judicial controversy over whether insurance proceeds constitute proceeds within the meaning of § 9–306 can be distilled into three basic positions that have been advanced by the courts. As will be shown, each fails to negate the conclusion that insurance proceeds are in fact proceeds under § 9–306. Those positions are: (1) § 9–104(g) prohibits insurance policy proceeds from being the proper subject for a security interest; (2) proceeds under § 9–306 only pertain to property voluntarily disposed of by the debtor and not to property that is subject to involuntary destruction, loss or depreciation; and, (3) an insurance policy is a personal contract which does not attach to or run with the property insured.

**(A)** *Section 9–104(g) Prohibition*

Section 9–104(g) of the UCC, as adopted in Pennsylvania (1964 version), states:

This Article does not apply

\* \* . \* \* \* \*

(g) to a transfer of an interest or claim in or under any policy of insurance

. . . .

12A Pa.C.S.A. § 9–104(g).

Plaintiff contends that insurance policy proceeds cannot be the proper subject for a security interest due to the prohibitions of § 9–104(g). In support of his position, plaintiff cites *In re Levine*, 6 UCC Rept. 238, 242–243 (D.Conn.1969), and *National Bedding & Furniture Industries, Inc. v. Clark*, 11 UCC Rept. 206, 208, 252 Ark. 780, 481 S.W.2d 690, 691 (1972). Both cases relied solely on the express language of § 9–104(g) without offering further explanation and held that insurance proceeds are excluded from coverage under Article 9 of the UCC. *See also National Fire Ins. Co. v. U. S.*, 22 UCC Rept. 1266, 1269 (N.D.Ind. 1977).

This position has been · forcefully and properly taken to task by the Second Circuit Court of Appeals in *PPG Industries, Inc. v. Hartford Fire Ins. Co., supra*, where the court held that:

[I]t should be apparent that this exclusion applies only to situations where the parties to a security agreement attempt to create a direct security interest in an

**9.** The common dictionary definition of the term "proceeds," as stated in *Webster's Third New International Dictionary*, 1807 (unabridged ed. 1971), is as follows:

*proceeds* . . . 1a: what is produced by or derived from something (as a sale, investment, levy, business) by way of total revenue: the total amount brought in: YIELD, RETURNS . . . b: the net profit made on something . . . 2: the net sum received (as for a check, a negotiable note, an insurance policy) after deduction of any discount or charges

Further, the common legal definition of "proceeds," as set forth in *Black's Law Dictionary*, 1369 (revised 4th ed. 1968), provides:

*PROCEEDS.* Issues; income; yield; receipts; produce; money or articles or other thing of value arising or obtained by the sale of property; the sum, amount, or value of property sold or converted into money or into other property. Wharton; *Blackford v. Boak*, 73 Or. 61, 143 P. 1136, 1137. Thus, goods purchased with money arising from the sale of other goods, or obtained on their credit, are proceeds of such goods. 2 Pars. Marit.L. 201; Bened.Adm. 290. *Proceeds does not necessarily mean cash or money. Phelps v. Harris*, 101 U.S. 370, 25 L.Ed. 855.

The word when applied to the income to be derived from real estate embraces the idea of issues, rents, profits, or produce. *Gorin Sav. Bank v. Early*, Mo.App., 260 S.W. 480, 483. It is synonymous with avails, use, and profits. *In re Coughlin's Estate*, 53 N.D. 188, 205 N.W. 14, 16.

insurance policy by making the policy itself the immediate collateral securing the transaction. For example, § 9–104(g) would be triggered in cases where a debtor uses his life insurance policy as a means for securing a debt owed to the insurer. In contrast, there is no basis for concluding that the statutory exclusion was intended to extend to security agreements which both create a direct security interest in inventory and/or equipment and require the debtor to provide his creditor with further protection by insuring the collateral. In rejecting such an argument, a leading treatise has made the following observation:

> There have been some cases suggesting that since subsection 9–104(g) excludes insurance from the general coverage of Article 9, insurance payments for damaged collateral cannot be proceeds under 9–306. While 9–104(g) might have been more artistically phrased, this argument proves too much; bank deposits are not generally within Article 9 either, but clearly bank deposits can constitute 9–306 proceeds. A new 9–306(1) covers this problem: insurance payments are proceeds, except to the extent that they are payable to one not a party to the security agreement.

Coogan, Hogan, Vagts, Secured Transactions Under the Uniform Commercial Code § 3A.03[c], at 207 (1974) (footnotes omitted).

531 F.2d at 60. *See also Paskow v. Calvert Fire Ins. Co., supra,* 579 F.2d at 953.

Of critical importance to this issue is comment 7 to § 9–104(g), which states:

> Rights *under life insurance* and other policies, and deposit accounts, are often

put up as collateral. Such transactions are often quite special, do not fit easily under a general commercial statute and are adequately covered by existing law. Paragraphs (g) and (k) make appropriate exclusions. (Emphasis added.)

■ It is quite clear, therefore, that § 9–104(g) was not intended to be a general prohibition against security interests in all types of insurance but only life insurance policies. This was obviously done to prevent debtors from foolishly or capriciously utilizing their life insurance policies as collateral.[10] This would, in effect, cut off any interest of the debtor's beneficiaries under the policy if at the debtor's death an outstanding debt existed. In the present case, the policy considerations of § 9–104(g) will not apply, since the insurance policy covers only property loss and not loss of life. Furthermore, the sole beneficiary under the policy is the Bank, by virtue of its assumedly valid designation as loss payee. In the event of damage or destruction to the property, the claim asserted by the Bank would not operate as an exclusion to the type of life insurance beneficiaries that § 9–104(g) was designed to protect. Furthermore, even if the Bank were not named as the loss payee under the policy, or if, as may be shown on referral to the bankruptcy court, its loss payee status is invalid, the obvious designated beneficiary[11] would be the debtor. This is because the debtor, as the owner of the goods, would want to be protected in the event that his goods were destroyed. Again, the purposes behind § 9–104(g) would not be frustrated because the debtor is not the type of beneficiary which § 9–104(g) was designed to protect. Therefore, §§ 9–104(g) and 9–306 are consistent and complimentary of each other. Section 9–

---

10. *See* I G. Gilmore, *Security Interests in Personal Property,* § 10.7 at 315 (1965); Henson, Insurance Proceeds as "Proceeds" Under Article 9, 18 *Cath.U.L.Rev.* 453, 456 (1969).

11. It should be carefully noted that a designated beneficiary under a policy may be different from the legal beneficiary under that policy; the latter being that person who is found to be legally entitled to the insurance proceeds despite designation. As the Court finds at pp.

397–399, *infra,* even if the secured party is not the designated loss payee under an insurance policy issued to cover secured collateral and the proceeds thereof, that party is nevertheless, under § 9–306, the legal beneficiary of insurance proceeds payable by reason of the loss to the secured collateral. In any event, a secured party, as a legal beneficiary under an insurance policy, is still not the type of beneficiary that § 9–104(g) was designed to protect.

104(g) was intended to restrict the use of life insurance policies as collateral for secured transactions and § 9–306 was designed to fill the void left by § 9–104(g), allowing proceeds to include insurance proceeds other than life insurance proceeds.[12]

Furthermore, it is also logical to assume that, because the UCC drafters only intended the § 9–104(g) prohibition to apply to life insurance policies, they found no need to expressly include non-life insurance proceeds as § 9–306 proceeds because non-life insurance proceeds were inherently allowable as collateral for a security interest under § 9–104(g). On the basis of the foregoing, this Court finds no merit in the argument advanced by the plaintiff, and the two court decisions cited as support thereof, that § 9–104(g) prohibits all insurance proceeds from being the subject of an Article 9 security interest.

### (B) *Voluntariness Under § 9–306*

The second line of reasoning put forth in the state decisions to disallow insurance proceeds as proceeds under a security interest speaks to the question of the voluntariness of *disposal*. Section 9–306(1) provides that:

> (1) "Proceeds" includes *whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of.* The term also includes the account arising when the right to payment is earned under a contract right. Money, checks and the like are "cash proceeds". All other proceeds are "non-cash proceeds".

12A Pa.C.S.A. § 9–306(1) (emphasis added).

Plaintiff argues that proceeds under § 9–306 only pertain to property voluntarily disposed of by the debtor and not to property that is subject to involuntary destruction, loss or depreciation. Three state court decisions have reached this conclusion, beginning with the *Hoffman v. Snack, supra,* decision which held that:

12. *One commentator has persuasively suggested that § 9–104(g), by its express language only applies to transfers and, since no transfer occurs with a security interest which is present*

Absent a sale, exchange or other disposition, there can be no proceeds such as this section contemplates. Petitioner's security remains solely in the depreciated automobile still in respondent's possession. 37 Pa.D. & C.2d at 147.

Second, the Rhode Island Supreme Court, in *Universal C.I.T. Credit Corp. v. Prudential Investment Co.,* 3 UCC Rept. 696, 101 R.I. 287, 222 A.2d 571 (1966), relying upon *Hoffman,* similarly held that:

> An analysis of the language of § 6A–9–306(1) furnishes further evidence of Prudential's inability to trace and reach the insurance moneys. It is our opinion that the loss here of the 1964 Diamond T was neither a sale, exchange, collection nor such other disposition as to come within the meaning of this section. We do not believe that the *disposition* referred to in this section can be construed to describe the demolition of the 1964 Diamond T and the subsequent compensation paid for its loss. *This involuntary conversion of the tractor is not a disposition within the meaning of this particular provision of the Code.*

222 A.2d at 575, 3 UCC Rept. at 701 (emphasis in original and added). *See also Quigley v. Caron,* 5 UCC Rept. 943, 946, 247 A.2d 94, 96 (Maine Sup.Jud.Ct.1968), relying upon *Universal C.I.T., supra.*

However, a contemporary line of federal court decisions has strongly differed with *Hoffman* and its progeny on the relevance of voluntariness under § 9–306. Recently, the Fifth Circuit Court of Appeals, in *Paskow v. Calvert Fire Ins. Co., supra,* stated:

> Second, the scope of § 9–306(1) is ambiguous and can be read as limited to voluntary disposition of the collateral. The section speaks of collateral being "sold, exchanged, collected or otherwise disposed of." The verb "disposed of" connotes an action, and all of the examples specifically given concern voluntary disposition. The 1966 version of § 9–306(2)

on perfection, § 9–104(g) is inapplicable to insurance proceeds. Boroff, Insurance Proceeds Under Section 9–306: Before and After, *Comm. L.J.* 442, 444 (Nov. 1974).

supports this reading by its reference to the debtor's "actions." But the ambiguity of § 9–306 can just as easily be resolved to favor the secured party. *Despite the examples, the section is not expressly limited to voluntary dispositions, and the inference from § 9–306(2) is hardly compelling.* Section 9–306(2) basically says that a security interest does not continue in collateral when the secured party authorizes its disposition. It is hard to imagine a secured party authorizing an involuntary disposition. Thus the subsection on authorized dispositions may logically refer only to voluntary dispositions even though the general section on proceeds has a broader scope.

579 F.2d at 953 (footnote omitted) (emphasis added).

A similarly persuasive argument was advanced by the court in *In re Hunter,* 9 UCC Rept. 928 (S.D.Ohio 1971), which held that:

> To read a question of intent, fault, or voluntariness into the statute for the purpose of defeating a security interest *would serve only to rely on concepts or legal fictions that do violence to both ordinary semantics and practices in the market place.* If one looks at the intent, then a debtor who deliberately wrecked his car would not defeat the secured party's interest, but one who suffered an accident beyond his control would. In either event, the collateral has been "disposed of." This court is unable to perceive any purpose in striking down a security interest and collateral clearly anticipated by the parties when they agreed specifically to carry insurance for such a loss or disposition of collateral as here involved.

9 UCC Rept. at 930 (emphasis added). *See also First National Bank of Highland v. Merchant's Mutual Ins. Co.,* 25 UCC Rept. 599, 601 (App.Div.3d 1978).

This Court is in full agreement with the holdings and reasoning of the *Paskow, Hunter* and *First National* decisions that

§ 9–306 pertains to both voluntary and involuntary dispositions. While *Hoffman* and progeny present novel arguments, their holdings are not expressly supported by the language or goals of § 9–306 and are at odds with § 9–207(2)(b), which provides, in pertinent part:

> (2) Unless otherwise agreed, when collateral is in the secured party's possession
>
> \* \* \* \* \* \*
>
> (b) the risk of accidental loss or damage is on the debtor to the extent of any deficiency in any effective insurance coverage . . . .

12A P.S.Pa. § 9–207(2)(b).

The dual purpose of § 9–207(2)(b) should be apparent. First, the provision was intended to prevent a debtor from acquiring a *partial* windfall profit by avoiding payment of the deficiency between insurance policy monies paid for the loss of the pledged goods and the actual debt owed. Clearly, the risk of loss has been placed upon the debtor by the Code. Similarly, the debtor or, as in the instant case, the trustee and, eventually, the unsecured creditors should not acquire a *total* windfall profit by collecting the insurance monies for the destroyed collateral which in the present action was in the debtor's possession. If the debtor (or the trustee and the unsecured creditors) should collect the insurance monies, it would result in the risk of loss having shifted to the secured party. Such a result is at odds with § 9–207(2)(b) and would be based only on the fact that the debtor had possession of the goods and the debtor had procured the insurance.[13] Certainly, if the debtor is to bear the risk of loss when the goods are in the possession of the secured party who maintains control over the goods, then surely when the debtor has possession and control of the goods and the ability to more easily prevent loss to the goods, the risk of loss should also be borne by him under § 9–306 if any semblance of consistency is to be maintained between §§ 9–207(2)(b) and 9–306.

---

**13.** *See William Skinner & Sons Shipbuilding & D.D. Co. v. Houghton,* 92 Md. 68, 48 A. 85 (Ct.App.1900) (mere possession does not vest vendor with unconditional and sole ownership of land where court finds vendee to be equitable owner due to acts of vendor, 48 A. at 91).

Second, as Gilmore states,[14] § 9–207(2)(b) not only places the risk of loss upon the debtor to avoid a *partial* windfall in the form of a deficiency, but it is intended: (1) to conversely protect both the secured party from any deficiency a loss might cause; and, (2) (because the debtor is responsible for only the deficiency) to prevent the secured party from collecting *both* the insurance monies and the debt owed. This second purpose of § 9–207(2)(b) is also applicable in the context of § 9–306 to prevent the secured party from experiencing a complete loss of *both* the collateral for the security interest which is destroyed and also any insurance monies payable for the loss. At the same time, it prevents the debtor, like the secured party under § 9–207(2)(b), from receiving *both* the insurance monies and forcing the secured party to bring a law suit to seek recovery of the amount due under the debt.[15] This is a far greater evil than § 9–207(2)(b) attempts to rectify. Both sections must be read in conjunction with each other because the UCC must be examined as a whole with its underlying purposes and policies applied across-the-board, absent reasons to the contrary, pursuant to § 1–102 of the UCC. Consistency must be maintained where possible instead of examining each section in a vacuum without the aid and guidance of the other provisions of the Code.

A final persuasive argument raised by one commentator concerns the issue of mutuality under the Code. If the debtor benefits by only having to pay the deficiency under § 9–207(2)(b), then the secured party should mutually benefit from the insurance his debtor acquires on secured property to satisfy the debt. *See* Note, 65 *Mich.L.Rev.* 1514, 1519 (May 1967).

■ Therefore, the Court rejects the plaintiff's argument that § 9–306 proceeds only apply to the voluntary disposition and not the involuntary loss, destruction or depreciation of collateral.

(C) *Insurance Policy as a Personal Contract*

The third and final argument raised by some state courts, as to why insurance monies are not § 9–306 proceeds, concerns the insurance policy being considered as a personal contract. The argument was best phrased by the Rhode Island Supreme Court in *Universal C.I.T. Credit Corp. v. Prudential Investment Corp., supra,* 3 UCC Rept. 696, 101 R.I. 287, 222 A.2d 571 (1966), which held:

> "Proceeds" by definition under the Code arises from either a sale, exchange, collection or other disposition of either the collateral or proceeds. Insurance moneys or proceeds, however, arise and are paid as the result of a contract. *An insurance contract or policy, so called, pertains to the persons to the contract and not to the item insured. It is a personal contract which does not attach to or run with the property insured.*
>
> \* \* \* \* \* \*
>
> We find, therefore, that the payments made by the insurance carrier in this cause are not proceeds as that term is used within the provisions of § 6A–9–306(1) of the Uniform Commercial Code. Insurance moneys or proceeds flow from the insurance contract and not from the property insured.

3 UCC Rept. at 700–701, 222 A.2d at 574 (emphasis added). *See also Quigley v. Caron, supra,* 5 UCC Rept. 943, 946, 247 A.2d 94, 95 (Maine Sup.Jud.Ct.1968). *See generally* 9 A.L.R.2d at 301.

The personal contract distinction has been the subject of marked criticism by both the courts and the commentators. In *Paskow v. Calvert Fire Ins. Co., supra,* the court held that the distinction lacked merit and analogized an insurance policy to a personal contract between a debtor and a third-party for the sale of collateral upon which a security interest had attached. In that situation, the court held that the proceeds of the sale would be payable to the

---

**14.** II G. Gilmore, *Security Interest in Personal Property,* § 42.7 at 1140–1141 (1965).

**15.** *See* discussion of burdensome litigation and the UCC at p. 398, *infra.*

secured party and not to the debtor, even though a personal contract had existed between the debtor and the buyer. 579 F.2d at 953 n.12.

It should be noted that the court in *Universal C.I.T.* relied upon pre-Code insurance decisions to support its holding that an insurance policy is a personal contract between the debtor and the insurance company.[16] However, various common law exceptions have been created by the courts to this general rule based on the special relationships of the parties and public policy considerations. One such exception is in the context of a mortgagor-mortgagee relationship discussed in *Aetna Ins. Co. v. Texas Thermal Industries, Inc., supra,* where the court held:

> First, Texas courts faced with analogous questions have held that where a mortgagor takes out casualty insurance on mortgaged collateral with a loss-payee clause in favor of the mortgagee, the claim of the mortgagee to any proceeds of the policy is prior to the claim of the mortgagor. . . .

591 F.2d at 1039 (footnote omitted).

Another exception occurs where a life tenant obtains property insurance on an estate without a prior agreement and later, due to the destruction of the property, collects the proceeds under the policy. The courts have held that any remaindermen to the life estate also have an interest in the insurance proceeds. *See* Note, 65 *Mich.L. Rev.* 1514, 1518 & n.22 (May 1967), *citing as examples Sampson v. Grogan,* 21 R.I. 174, 42 A. 712 (1899), and *Clyburn v. Reynolds,* 31 S.C. 91, 9 S.E. 973 (1887).

A further exception has been established in the situation of a buyer and seller of land. Under common law, if property was destroyed between the time of the signing of the agreement of sale and the time of conveyance, the risk of loss fell on the buyer. *See Rayner v. Preston,* 18 Ch.D. 1 (1881). This allowed the seller to collect under his own insurance policy for the loss of the land and also to recover the full purchase price from the seller. The buyer received neither the land in the condition he bargained for, nor a refund of the purchase monies paid. Due to the clear inequities of this common law rule, many courts and state legislatures allowed the buyer to claim the proceeds under the seller's insurance policy if the land was destroyed prior to conveyance. *See* Note, *Mich.L.Rev.* 1514, 1518–1519 (May 1967), *citing Brady v. Welsh,* 200 Iowa 44, 204 N.W. 235 (1925); *William Skinner & Sons Shipbuilding & D.D. Co. v. Houghton,* 92 Md. 68, 48 A. 85 (Ct.App.1900).

The obvious rationale underlying these exceptions to the general rule is that the buyer, remaindermen or mortgagee should not suffer a loss while the seller, life tenant or mortgagor receives the benefit of those insurance monies for the destruction of property in which the buyer, *et al.,* have an equitable interest. The insurance policy has been held by these courts to be for the benefit of the owner of the equitable interest in order to protect that very interest, no more and no less, and leaving the other party in the role of a trustee of the goods. The equitable party in interest is a type of third-party beneficiary under the insurance policy. This rationale, based upon equitable considerations, can be seen to equally apply in the context of a secured party under Article 9.

A secured party is a type of third-party beneficiary under an insurance policy maintained by the debtor for the purposes of covering the value of the collateral under the security agreement, in respect to which precise collateral the secured party has a valid, legal and vested interest. The secured party should not be the ultimate loser when the insured collateral is destroyed, for the gratuitous benefit of unsecured third parties. In the instant case, those third parties are the trustee in bankruptcy, and

---

16. *Universal C.I.T., supra,* 3 UCC Rept. at 700–701, *citing In the Matter of Largo Products, Inc.,* 8 Misc.2d 594, 167 N.Y.S.2d 846 (N.Y.Sup. Ct.1957); *Rath v. Aerovias Interamericanas de Panama,* 205 Misc. 135, 127 N.Y.S.2d 231 (N.Y. Sup.Ct.1953); *Shelton v. Providence Washington Ins. Co.,* 131 S.W.2d 330 (Tex.Civ.App. 1939); *Nichols v. Baxter,* 5 R.I. 491 (1858).

ultimately the unsecured creditors who will proportionately share after the distribution of the Bankrupt's estate. These unsecured third parties would receive a windfall profit at the expense of the secured party who had fully complied with the requirements of the law concerning the perfecting of a security interest in the collateral. In the case of a debtor who did not file for bankruptcy, the debtor himself would receive the windfall by collecting the insurance monies to the exclusion of the party the debtor intended to secure. Arguably, the non-bankrupt debtor would, after the destruction of the collateral, have assets in the form of the insurance monies and could be required by the secured party, through litigation, to pay over those monies to satisfy the debt still owed. However, that is the exact type of unfair and, hence, unnecessary formality that the courts, in creating exceptions to the general rule, have attempted to avoid. Payment of the insurance proceeds to the secured creditor directly sensibly avoids the necessity of the secured party having to bring a legal action to procure payment of an admitted debt. Article 9 was enacted, *inter alia*, to remove unnecessary litigation as an impediment to commerce and to keep business transactions as simple and direct as possible. Monies admittedly due should be expected to pass directly and automatically and with the further expectation that unnecessary, expensive and time-consuming litigation need not be invoked in clear cases, notwithstanding the rank enjoyed by formality, ceremony and deliberative court procedures in other circumstances.

These purposes are the exact type of public policy considerations that have given rise to the various exceptions to the personal contract rule. The Court finds, under the circumstances of the issue before us here, a further exception in light of those public policy considerations in the situation of a secured creditor under Article 9 which is currently embodied in § 9–306.

It is important at this juncture to distinguish the instant action from the decision of the Third Circuit Court of Appeals in *Keystone Fabric Laminates, Inc. v. Federal Insurance Co.*, 407 F.2d 1353 (3d Cir. 1969). There, the court held that, where a bailee had on its own initiative secured insurance to protect goods of others held in its possession, a bailor was not entitled to a priority as to proceeds payable under that insurance policy if a loss occurred. The court stated that:

> Finally, appellants claim that to give plaintiff priority would defeat the purpose of the policy, viz., to protect the customers from loss. We think, however, that the policy was not taken out any more for the customers' benefit than for the plaintiff's own protection. In such circumstances, we can find no compelling purpose behind the policy which may be defeated by granting plaintiff the priority it seeks.

407 F.2d at 1356–1357. *See also Gardner v. Freystown Mutual Fire Ins. Co.*, 350 Pa. 1, 4–5, 37 A.2d 535 (1944).

In the instant action, the debtor procured property insurance at the direction of the Bank as expressly required in the July 20, 1970, security agreement. The Bank obviously did not require the debtor to procure the insurance to protect the interests of the debtor himself or third-party unsecured creditors from loss to the goods held as collateral. The only reasonable and unmistakable purpose the Bank could have had in requiring this coverage was to satisfy a business concern it had with the debtor because that is the only relationship that existed between them. In turn, the only business subject the undertaking *could* have applied to was the security transaction because that was the only object of their engagement. If, as in *Keystone*, the Bankrupt, at its own instance, had secured property insurance through a separate insurance policy to protect itself from loss to the goods and not because of a prior contractual requirement from the Bank, the Bankrupt and not the Bank would be entitled to claim the insurance monies under that policy. And this result is no different than that previously discussed because, if the lender could recover the insurance proceeds from a coverage it never intended to exact, or con-

ceivably even know about, *it* would be the recipient of the windfall at the expense of the intended beneficiary. While the policy of *Keystone* is the same as that to be applied here, the result must be different because the facts are different and, therefore, *Keystone* is not controlling.[17]

### IV. *Loss-Payee Clause*

In the present case, the parties had entered into an agreement whereby the Bank was named as the loss payee under the insurance policy. Other courts have held that a loss-payee clause is important to show the intent of the parties to determine the allocation of the insurance monies under § 9–306. *See Firemen's Fund American Ins. Co. v. Ken-Lori Knits, Inc.*, 399 F.Supp. 286, 290–291 (E.D.N.Y.1975). This Court finds that the issue goes beyond the intent of the parties and is premised upon public policy considerations and equitable principles underlying Article 9 that dictate that the debtor cannot be blessed with an undeserved profit solely due to the accidental destruction of collateral. The Court's decision is not narrowly limited to those situations where there is a loss-payee clause naming the secured party as the beneficiary under the insurance policy on the collateral. In this regard, the Court concurs with a similar holding by the Second Circuit Court of Appeals in *PPG.* 531 F.2d at 61.

 However, as discussed previously, today's decision does apply to factual situations where the secured party either expressly requires in the security agreement, by other contractual methods or by a loss-payee clause, that the debtor must maintain insurance on the secured collateral. The decision does not apply to those situations where the debtor secures insurance on his own initiative for his own purposes to protect himself from loss of his goods which also happens to serve as secured collateral for a debt.

17. Note also, as one commentator persuasively points out, the argument that insurance proceeds are not proceeds under § 9–306, because they arise out of a contract right, is inconsistent with other Code provisions allowing con-

### V. *Notice and Retroactivity*

One court has considered the argument that a security interest cannot be maintained in insurance proceeds due to the lack of notice of such an interest to third parties. As the court in *In re Whitacre*, 21 UCC Rept. 1169 (S.D.Ohio 1976), stated:

The Bank acknowledged the usual context of the word in reserving the right to purchase insurance to cover its interest and to charge the expense as coverage under the secured amount. Even though the bankrupt was obligated to deliver a policy with proper endorsements to the Bank and was personally liable for failure to do so, there was no notice to third parties or the casualty insurance company by the financing statement from the procedure of merely placing a mark in the square space designated "Proceeds".

21 UCC Rept. at 1175 (emphasis added).

 The issue of notice raised by the *Whitacre* court goes, in essence, to the issue of whether this Court's decision today on the issue of insurance proceeds under § 9–306 should be given retroactive or only prospective application. Retroactive application of a court's decision is not constitutionally mandated. *Linkletter v. Walker*, 381 U.S. 618, 629, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

The United States Supreme Court, in the case of *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), addressed the issue of retroactivity in the context of civil actions and held:

In recent years, the nonretroactive application of judicial decisions has been most conspicuously considered in the area of the criminal process. *E. g., Mackey v. United States*, 401 U.S. 667 [, 91 S.Ct. 1160, 28 L.Ed.2d 404;] *Hill v. California*, 401 U.S. 797 [, 91 S.Ct. 1106, 28 L.Ed.2d 484;] *Desist v. United States*, 394 U.S. 244 [, 89 S.Ct. 1030, 22 L.Ed.2d 248;]

tract rights to serve as collateral and proceeds, §§ 9–102(1)(a) and 9–306(1). *See* Boroff, Insurance Proceeds Under Section 9–306: Before and After, *Comm.Law Journal* 442, 444 (Nov. 1974).

*Linkletter v. Walker,* 381 U.S. 618 [, 85 S.Ct. 1731, 14 L.Ed.2d 601.] But the problem is by no means limited to that area. The earliest instances of nonretroactivity in the decisions of this Court—more than a century ago—came in cases of nonconstitutional, noncriminal state law. *E. g., Gelpcke v. City of Dubuque,* 1 Wall. 175 [, 17 L.Ed. 520;] *Havemeyer v. Iowa County,* 3 Wall. 294 [, 18 L.Ed. 38;] *Railroad Co. v. McClure,* 10 Wall. 511 [, 19 L.Ed. 997]. It was in a noncriminal case that we first held that a state court may apply its decisions prospectively. *Great Northern R. Co. v. Sunburst Oil & Refining Co.,* 287 U.S. 358 [, 53 S.Ct. 145, 77 L.Ed. 360.] And, in the last few decades, we have recognized the doctrine of nonretroactivity outside the criminal area many times, in both constitutional and nonconstitutional cases. *Cipriano v. City of Houma,* 395 U.S. 701 [, 89 S.Ct. 1897, 23 L.Ed.2d 647;] *Allen v. State Board of Elections,* 393 U.S. 544 [, 89 S.Ct. 817, 22 L.Ed.2d 1;] *Hanover Shoe [, Inc.] v. United Shoe Machinery Corp.,* 392 U.S. 481 [, 88 S.Ct. 2224, 20 L.Ed.2d 1231;] *Simpson v. Union Oil Co.,* 377 U.S. 13 [, 84 S.Ct. 1051, 12 L.Ed.2d 98;] *England v. State Board of Medical Examiners,* 375 U.S. 411 [, 84 S.Ct. 461, 11 L.Ed.2d 440;] *Chicot County Drainage Dist. v. Baxter State Bank,* 308 U.S. 371 [, 60 S.Ct. 317, 84 L.Ed. 329].

In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish *a new principle of law, either by overruling clear past precedent on which litigants may have relied,* see, e. g., *Hanover Shoe [, Inc.] v. United Shoe Machinery Corp., supra,* [392 U.S.] at 496 [, 88 S.Ct. 2224, at 2233,] *or by deciding an issue of first impression whose resolution was not clearly foreshadowed,* see, e. g., *Allen v. State Board of Elections, supra,* [393 U.S.] at 572 [, 89 S.Ct. 817, at 835.] Second, it has been stressed that "we must * * * weigh the merits and demerits in each case by looking to the prior history of the rule in question,

its purpose and effect, and whether retrospective operation will further or retard its operation." *Linkletter v. Walker, supra,* [381 U.S.] at 629 [, 85 S.Ct. 1731, at 1738.] Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." *Cipriano v. City of Houma, supra,* [395 U.S.] at 706 [, 89 S.Ct. 1897, at 1900]. 404 U.S. at 105–107, 92 S.Ct. at 355 (footnote omitted) (emphasis added).

Under the *Chevron* test, the first inquiry that must be made is: Does the Court's decision in the instant action establish a new rule or principle of law? If the answer is "yes," then third-party creditors cannot be retroactively held to the new rule when they justifiably relied upon prior law at the time they transacted their business affairs with the debtor. *See Kacher v. Pittsburgh Nat. Bank,* 545 F.2d 842, 848 (3d Cir. 1976) (Gibbons, J., dissenting). The Supreme Court has phrased the inquiry in terms of whether the decision involves "complex issues of first impression—issues subject to rational disagreement." *Allen v. State Bd. of Elections,* 393 U.S. 544, 572, 89 S.Ct. 817, 835, 22 L.Ed.2d 1 (1969). Or does it "constitute a sharp break in the line of earlier authority or an avulsive change which caused the current of the law thereafter to flow between new banks"? *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 499, 88 S.Ct. 2224, 2234, 20 L.Ed.2d 1231 (1968). The federal circuit courts have asked: Did the decision, "either (1) overrule clear past precedent or (2) disrupt a practice long accepted and widely relied upon"? *Bunker v. Wise,* 550 F.2d 1155, 1157 (9th Cir. 1977), *quoting United States v. Bowen,* 500 F.2d 960, 975 (9th Cir. 1974) (Wallace, J., dissenting), *aff'd on other grounds,* 422 U.S. 916, 95 S.Ct. 2569, 45 L.Ed.2d 641 (1975).

However, retroactive application should not be denied if the judicial decision was clearly foreshadowed in previous cases

and, therefore, reliance on the old rule of law was not justified. *United States ex rel. Allison v. State of New Jersey*, 418 F.2d 332, 341 n.20 (3d Cir. 1969), *cert. denied*, 400 U.S. 850, 91 S.Ct. 68, 27 L.Ed.2d 88 (1970).

In the present action, as of the time of the July 20, 1970, security agreement between the Bank and the Bankrupt, not one state or federal court decision had held that insurance proceeds were § 9–306 proceeds, although several state and federal courts had held they were not. As of July 12, 1977, the date the Bankrupt filed his Chapter XI petition, only one federal court decision had held that insurance proceeds did in fact constitute proceeds within the meaning of § 9–306. That decision was *PPG Industries v. Hartford Fire Ins. Co., supra*, decided February 12, 1976. As a decision of the Second Circuit Court of Appeals, it was not conclusively binding on this Court as a district court in the Third Circuit. Although today this Court has relied upon *PPG* for persuasive support, the Second Circuit decision is not judicially controlling on this Court in the way a decision of the United States Supreme Court or the Third Circuit Court of Appeals would have a definitive *stare decisis* effect. *See Jorsch v. LeBeau*, 449 F.Supp. 485, 488 (N.D.Ill.1978); *Morse Electro Products Corp. v. S.S. Great Peace*, 437 F.Supp. 474, 489 n.21 (D.N.J.1977); *Aknin v. Phillips*, 424 F.Supp. 104, 105 (S.D.N.Y.1976); *Bonham v. Dresser Industries, Inc.*, 424 F.Supp. 891, 896 (W.D.Pa.1976), *aff'd in part, rev'd in part on other grounds*, 569 F.2d 187 (1977).

This Court finds that any third-party creditor, who had examined the July 20, 1970, security agreement or subsequent continuation statements between the Bank and the Bankrupt and who engaged in business transactions with the Bankrupt during the period before the filing of the Chapter XI petition in bankruptcy, would have concluded that, in light of the then-existing case law, insurance proceeds were not proceeds under § 9–306.

In conclusion, based upon the requirements set forth in *Chevron Oil Co. v. Huson, supra*, the Court finds that the present issue of whether insurance proceeds are proceeds under § 9–306 involves complex issues of first impression in this circuit and constitutes a sharp break from the line of earlier authority, thereby failing to meet the first requirement of *Chevron* and, thus, should not be applied retroactively.

## VI. Referral and Certification

Finally, at this juncture, on the present factual record, the Court is unable to address the additional arguments raised by the parties concerning, to wit: (1) whether the Bankrupt made a voidable preferential transfer to the defendant Bank under section 60 of the Bankruptcy Act when he paid over the insurance monies to the Bank; and, (2) whether the designation of the Bank as a loss payee under the Bankrupt's insurance policy on the collateral during the pendency of Chapter XI proceedings was an invalid execution under section 70 of the Bankruptcy Act. The Court finds that, because the factual basis for these issues has not been fully developed and because the Court's Order today does not retroactively apply the determination on the status of insurance proceeds under § 9–306, these material, factual and legal issues are still very relevant to the present action. This is true because the trustee in bankruptcy is still not entitled to the insurance proceeds under the policy until the above bankruptcy issues are finally resolved. Therefore, the Court will refer the above two bankruptcy issues to the bankruptcy court in this district, pursuant to Fed.R.Civ. p. 53, for further factual proceedings and a legal determination. However, the Court will certify *sua sponte* for immediate appeal its Order pursuant to 28 U.S.C. § 1292(b) because the Court finds that the issues presented involve controlling questions of law as to which there is a substantial ground for difference of opinion and an immediate appeal will materially advance the ultimate termination of the litigation.